UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ENCORE BIG BEAVER LLC,

    Plaintiff,                                         Civil Action No. 20-CV-12345

vs.                                                 HON. BERNARD A. FRIEDMAN

UNCLE JULIO'S OF FLORIDA, INC.
and UNCLE JULIO'S CORPORATION,

    Defendants.
_____/

**<u>OPINION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT,
AND GRANTING DEFENDANT UJ-FL'S MOTION TO AMEND ITS ANSWER</u>**

        This matter is presently before the Court on the parties' cross-motions for summary judgment [docket entries 17 and 22] and defendant Uncle Julio's of Florida, Inc.'s motion for leave to amend its answer [docket entry 26]. The motions are fully briefed. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide these motions without a hearing.

        This is a contract dispute. Plaintiff Encore Big Beaver LLC ("Encore") is a Michigan-based company and the owner of commercial retail property located in Troy, Michigan. Compl. ¶¶ 1, 11. Defendant Uncle Julio's Corporation ("UJC") is headquartered and incorporated in Texas and is the parent company of defendant Uncle Julio's of Florida, Inc. ("UJ-FL"), which is incorporated in Florida and principally based in Texas (collectively, "defendants"). *Id*. ¶¶ 2-3, 5. Defendants operate a chain of Tex-Mex restaurants around the country. *See id*. ¶ 4.

        Plaintiff alleges that "[o]n or about September 17, 2018, Encore entered into a written Lease Agreement (the 'Lease') with UJ-FL."[1] Compl. ¶ 12 (footnote omitted). "The term of the

---

[1] The Lease was subsequently amended on three occasions–March 18, 2019; September 25, 2019; and January 9, 2020–although none of the modifications to the terms of the Lease are relevant

Lease was for 10 years, with two 7-year renewal options." *Id*. ¶ 14. Plaintiff adds that

> [t]o induce Encore to enter into the Lease, on or about September 12, 2018, Thomas Vogel, as CEO of UJC, signed a guaranty, through which UJC agreed to absolutely and unconditionally guarantee to Encore the performance by UJ-FL of each and every covenant, agreement and obligation of UJ-FL under the Lease including, without limitation, the payment to Encore, after applicable notice and cure periods, of all sums due under the Lease at the time such sums shall be due and payable, and the timely completion of the "Tenant's Work," in accordance with the Lease terms (the "Guaranty[]").

\* \* \*

> Under the terms of the Lease, rents payable were not due until the "Rent Commencement Date." Specifically:
>
>> Following Tenant's satisfaction of all of its contingencies . . . , subject to the Blackout Period, Minimum Rent and Other Charges shall commence on the date that is the earlier of (a) 210 days after the later of (i) Tenant's receipt of its building permits and (ii) Landlord's completion of all Landlord's Work or (b) that date that Tenant opens for business in the Premises.

*Id*. ¶ 15, 21 (quoting the Lease § 1.1(f)).

Plaintiff states that on March 24, 2020, the governor of Michigan issued an executive order "that effectively shut down construction activities across the state due to [the] Covid-19 [pandemic]." *Id*. ¶ 22. The Lease agreement contained a force majeure clause that covered delays in "performing work or doing acts required under the Lease" that were not the fault of the party delayed, including those caused by "governmental laws or regulations." *Id*. ¶ 23. The force majeure clause provided in relevant part that

---

to the resolution of the parties' cross-motions for summary judgment. *See* Pl.'s Ex. 2 (First Lease Amendment); Pl.'s Ex. 3 (Second Lease Amendment); Defs.' Ex. 1, at PageID.265 (Third Lease Amendment).

2

> the period for performance . . . shall be extended for a period equivalent to the period of such delay. Notwithstanding the foregoing, th[is] provision[] . . . shall at no time operate to excuse Tenant from any obligations for payment of Minimum Rent or Other Charges required by the terms of this Lease when the same are due, and all such amounts shall be paid when due.

*Id.* (quoting the Lease § 24.5). After forty-five days of delay, the pandemic-related construction suspension was lifted. *Id*. ¶ 25.

Plaintiff alleges that "[o]n or about June 9, 2020, Scott Lark[, UJC's senior real estate director,] sent and email to Jason Hamama, Encore's CEO, and indicated . . . that UJ-FL wanted to delay the tenant's buildout of the Premises until November 2021, with Rent Commencement Date of June 2022." *Id*. ¶ 26. Plaintiff states that in the email, Lark expressed UJC's intention to move forward with the Lease agreement, but stated that the company had experienced pandemic- and protest-related business interruptions and financial shortfalls. *See id*. (quoting Pl.'s Ex. 5 (June 9, 2020 email)). In this same communication, Lark mentioned that UJC had "obligations on other projects, so [it would] need to delay the construction start of the Troy site." *Id*. (quoting Pl.'s Ex. 5 (June 9, 2020 email)).[2] Plaintiff alleges that following this exchange the parties were unable to agree

---

[2] Lark's June 9, 2020, email states in its entirety as follows:

> We appreciate the time to discuss the Troy, MI location for Uncle Julio's. As we discussed at length, Uncle Julio's is continuing to be impacted by the pandemic and protests in various parts of the country.
>
> We acknowledge you have many challenges and we are thankful for your willingness to consider a lease modification. We still feel strongly about the opportunity along Big Beaver but have early indications that recovery to pre-pandemic sales is going to take longer than we originally anticipated. Sales at our Texas, Oklahoma, and Tennessee restaurants have been promising given the occupancy limitation and preference for patio seating. Today, we have 11 restaurants with the dining rooms open and system-wide sales are down ~62 percent from our prior year. We plan on reopening the 10 restaurants in greater Washington D.C. within

3

upon amended Lease terms. *Id*. ¶¶ 30-34.

Plaintiff states that "[u]nder the doctrine of anticipatory breach, a party may cease performance under a contract when the other party is in material anticipatory breach." *Id*. ¶ 41. Plaintiff contends that Lark's June 9 email communicated defendant UJ-FL's "unequivocal intention not to perform under the terms of the Lease" and thereby "excuse[d] Encore's *further* performance." *Id*. ¶¶ 41, 45 (emphasis in original).

Plaintiff raises two claims in the complaint: Breach of lease agreement by UJ-FL (Count I) and breach of guaranty by UJC (Count II).[3] *Id*. ¶¶ 43-57. Plaintiff seeks damages plus pre- and post-judgment interest, as well as attorney fees and costs. Plaintiff states that "[a]s of July 23, 2020, the project costs due and owing to Encore by UJ-FL and UJC, jointly and severally, are not less than $2,116,038.00 under the Lease and Guaranty." *Id.* ¶ 38.

---

> the next two weeks. Several in the Colorado and Chicago markets are to soon follow.
>
> We are continuing to burn through cash weekly, but we expect we'll be cash flow positive in July. The near-term challenge for us is buying additional time to defer our immediate obligations so we can build up enough cash to begin paying down our debts and finishing the construction of our Lubbock, TX and Frontenac, MO restaurants. They were under construction but were forced to stop during the pandemic. We also have obligations on other projects, so we will need to delay the construction start of the Troy site until November of 2021 with a RCD [(Rent Commencement Date)] of June 1, 2022.
>
> We are hopeful that we can save the project by adjusting the timing. Please feel free to contact us after you have had a chance to discuss with your team.

Pl.'s Ex. 5, at PageID.74.

[3] Plaintiff includes three counts in its complaint, the third of which is "award of attorneys' fees and costs." However because this is a remedy and not a cause of action, the Court will only address the parties' arguments as to Count I (breach of lease) and Count II (breach of guaranty).

4

**I. Cross Motions for Summary Judgment**

    **A. Defendants' Motion for Summary Judgment**

In their motion for summary judgment, defendants contend that they did not "*unequivocally declare*, at a time prior to performance through [their] words or actions, *that [they] will not perform*," and therefore did not anticipatorily breach (or repudiate) their contract with plaintiff. Defs.' Br. at 1 (emphasis in original) (quoting *Midfield Concession Enters., Inc. v. Areas USA, Inc.*, 130 F. Supp. 3d 1122, 1137 (E.D. Mich. 2015)). Defendants argue that "[t]o determine whether or not a repudiation occurred, the Court must look to the party's intention as manifest[ed] by acts and words," *id*. at 7 (quoting *Midfield Concession*, 130 F. Supp. 3d at 1137), and that plaintiff cites neither acts nor words that unequivocally communicated defendants' intention not to perform under the Lease. *See id*. at 10-22. Defendants emphasize that the bar to establish repudiation is "extremely high," requiring more than defendants' silence, uncertainty, or request for modification. *Id*. at 12-15. Defendants argue that while the communications between Lark and Hamama may have "unequivocally indicated that UJ-FL wanted to delay the tenant's buildout of the Premises until November 2021," not one of the "twenty-four emails or text messages Encore describes in its answer to [defendants' first interrogatory]" unequivocally indicates that defendants would not perform their contractual obligations. *Id*. at 15-16. Defendants contend that "[a]t most, UJ-FL was seeking to negotiate another amendment to the Lease [and] . . . [t]he very fact that UJ-FL wanted to delay its performance shows that it would perform its obligations." *Id*. at 15-16. Defendants assert that the parties' failure to reach an agreement about an amendment to the terms of the Lease, "simply meant that the existing Lease terms remained in place." *Id*. at 19.

As to plaintiff's claim of breach of guaranty, defendants argue that the claim fails for "any or all of three reasons." *Id*. at 22. First, defendants cite *Com. Place, LLC v. Jenna B Corp*, No.

5

262747, 2005 WL 2655966, at *1 (Mich. Ct. App. Oct. 18, 2005), for the proposition that the doctrine of anticipatory breach only applies to bilateral contracts, whereas a guaranty is a unilateral contract. *Id*. at 22-23. Second, defendants contend that Encore's requested remedy of "rescission-and-restitution" "is not available against a defendant whose defaulted obligation is exclusively to pay money[,] . . . [which] is necessarily the case with a guaranty." *Id*. at 23. Third, defendants argue that "by its terms, the Guaranty does not apply to restitution damages" because UJC only assured the fulfillment of UJ-FL's contractual obligations. *Id*. at 24. Rather than seeking to enforce UJ-FL's duties under the Lease, plaintiff now seeks to rescind the Lease, which, defendants argue, falls outside the terms of the Guaranty. *Id*. Defendants further contend that if the Court finds that UJ-FL did not repudiate the Lease, then "there could be no liability under the Guaranty." *Id*. at 22.

In response, plaintiff argues that the "Mr. Lark's words say it all. 'We will need to delay' is a declaration, at a time prior to performance that UJ-FL *will not* perform." Pl.'s Resp. Br. at 8 (emphasis in original). Plaintiff adds that prior emails between the parties' representatives illustrate "the rising tensions between the parties[, the] frustration by Encore leadership with [the] lack of clarity from UJ-FL/UJC management[, and] . . . Encore's desire to continue with the project." *Id*. at 8. Plaintiff states that "Mr. Lark could have said something more equivocal, such as 'we hope we can dely' or 'we would like to delay' or 'would Encore consider a delay' but Mr. Lark didn't do that. Instead, he stated '**we will need to delay**' clearly and unequivocally." *Id*. at 12 (emphasis in original).

Regarding defendant's liability under the Guaranty, plaintiff states that

> [t]he Guaranty speaks for itself: UJC agreed to absolutely and unconditionally guarantee to Encore the performance by UJ-FL of each and every covenant, agreement and obligation of UJ-FL under the Lease including, without limitation, the payment of damages that Encore may suffer as a result of any default or breach under the

6

Lease.

*Id*. at 13 (citing Pl.'s Ex. 1, at Ex. E.). Plaintiff further contends that "[d]efendants' argument that Encore is seeking only a rescission-restitution remedy is not accurate. The words 'rescind' or 'rescission' do not appear in Encore's complaint." *Id*.

### B. Plaintiff's Motion for Summary Judgment

In its cross-motion for summary judgment, plaintiff raises substantially similar arguments to those raised in its response to defendants' motion. Plaintiff contends that "[s]ummary judgment on Count I . . . should be granted because Encore can demonstrate that UJ-FL unequivocally communicated to Encore on June 9, 2020 that **[UJ-FL] will need to delay** the construction start of the Troy site . . . ." Pl.'s Br. at 9 (emphasis in original). Plaintiff also highlights the communications between the parties prior to the June 9, 2020, email, as well as those following it. *See id*. at 9-12. Plaintiff argues that the subsequent communication indicates that "Encore was willing to modify the current Lease," but yet defendants "went silent and no further Lease amendment communications occurred." *Id*. at 11-12. Plaintiff contends that "the reasonable interpretation of Scott Lark's statements is that UJ-FL *cannot and will not perform*." *Id*. at 12 (emphasis in original).

Regarding Count II, plaintiff contends that "UJC is liable to Encore under the Guaranty as a result of UJ-FL's breach of the Lease, including the 'timely completion of Tenant's Work' which is what UJ-FL has anticipatorily breached." *Id*. at 14. Therefore, plaintiff concludes, "[i]f the court grants Encore's anticipatory breach claim and finds UJ-FL liable for such breach, then Encore has demonstrated a basis for UJC's liability under the Guaranty." *Id*.

In response, defendants provide nine reasons why, in their view, Lark's email did not repudiate the Lease: (1) the language contained in Lark's email is not sufficient to establish

7

repudiation, as it did not indicate that UJ-FL "would not or could not perform its contractual obligations," Defs.' Resp. Br. at 4; (2) even if Lark communicated that UJ-FL would not timely perform, this does not constitute repudiation, *see id.* at 6; (3) although plaintiff states that Lark's language could be "reasonably interpreted to mean that UJ-FL will not or cannot perform, the existence of other reasonable interpretations means that Lark's email did not "*unequivocally* declare anything," *id.* (emphasis in original); (4) "Lark's statement needs to be understood in the context of UJ-FL's financial obligations" – under the terms of the Lease, "the earliest rent actually could be due would be mid-2021. . . . And while Lark said, 'We are continuing to burn through cash weekly,' he further advised Hamama 'we expect we'll be cash flow positive in July,'" *id*. at 7; (5) "UJ-FL's payment obligations were contingent upon Encore completing Landlord's Work," and "Encore was well-aware that those obligations would not accrue anytime soon," *id.*; (6) "Lark expressly told Hamama: 'We still feel strongly about the opportunity along Big Beaver,'" *id.* at 8; (7) Lark's email was an "an invitation to amend, or modify, the Lease [and] [r]equesting a modification of the contract terms does not constitute repudiation," *id.*; (8) Encore made clear through various communications that it "did not interpret Lark's email as a repudiation, but rather as a request to amend the Lease," *id*. at 9; and (9) "on June 30 and August 7, 2020, UJ-FL sent letters to Encore in which UJ-FL was asserting its rights under the Lease on account of Encore's failure to timely complete Landlord's Work." *Id*. at 10.

As to plaintiff's claim of breach of guaranty, defendants reiterate the arguments expressed in their own motion for summary judgment–namely that (1) "if UJ-FL did not repudiate the Lease . . . there cannot be liability under the Guaranty"; (2) "UJC has guaranteed only the fulfillment of UJ-FL's contractual obligations. If the Lease provided some circumstance under which

8

UJ-FL had to pay for Encore's project costs, the Guaranty might apply to these damages. But there is no such provision in the Lease"; and (3) "repudiation, or anticipatory breach, does not apply to a guaranty." *Id*. at 12-15.

**C. Legal Standards**

> Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine dispute of material fact exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). In applying the summary judgment standard, the court must review all materials supplied, including pleadings, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

*United States v. White*, No. 17-6022, 2018 WL 4215614, at *2 (6th Cir. July 11, 2018).

"A federal court sitting in diversity applies the substantive law of the forum state." *Adkins v. Chrysler Fin. Corp.*, 344 F. App'x 144, 147 (6th Cir. 2009). "When deciding a diversity case under state law, a federal court must apply the law of the state's highest court. If, however, the state's highest court has not decided the applicable law, then the federal court must ascertain the state law from all relevant data," which include judgments from the state appellate court. *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F.3 1126, 1130 (6th Cir. 1995) (internal quotation marks and citations omitted).

In the State of Michigan, "[a]n anticipatory breach or repudiation of contract occurs when a contracting party unequivocally declares, at a time prior to performance, through its words or actions, that it will not perform." *Midfield Concession*, 130 F. Supp. 3d at 1137 (citing *Sargent v. City of Muskegon Heights*, No. 175145, 1996 WL 33347922, at *2 (Mich. Ct. App. Dec. 6, 1996)).

9

Further, the Michigan Court of Appeals has stated that

> [a] party's intention, as manifested by acts and words, controls whether an anticipatory breach has occurred. A party's acts must be voluntary and affirmative, and must make it actually or apparently impossible for the party to perform under the contract. A party's words must be capable of being reasonably interpreted to mean that the party cannot or will not perform under the contract.

*Com. Place, LLC*, 2005 WL 2655966, at *1 (citing *Paul v. Bogle*, 484 N.W.2d 728, 735-36 (Mich. Ct. App. 1992)). "Under the doctrine of anticipatory breach the innocent party has the option either to sue immediately for the breach of contract or to wait until the time of performance." *Midfield Concession*, 130 F. Supp. 3d at 1137 (internal quotation marks omitted) (citing *Stoddard v. Mfrs. Nat. Bank of Grand Rapids*, 593 N.W.2d 630, 640 (Mich. Ct. App. 1999)).

**D. Analysis**

Having reviewed the parties' briefs and exhibits, the Court concludes that defendants' motion for summary judgment should be granted and plaintiff's motion for summary judgment should be denied. The parties agree on the relevant facts. The core question before the Court is whether "Scott Lark's June 9, 2020 email constitutue[s] a repudiation, or not[.]" Defs.' Resp. Br. at 3.

In this email, Lark discussed UJ-FL's financial difficulties caused by the Covid-19 pandemic and used the phrase "we will need to delay." Defs.' Ex. 4, at PageID.292. However, he also unequivocally stated that "[w]e still feel strongly about the opportunity along Big Beaver," "we expect we'll be cash flow positive in [one month]," "we are thankful for your willingness to consider a lease modification," and "[w]e are hopeful that we can save the project by adjusting timing." *Id*. Plaintiff recognized Lark's email as a request for delay, *see id*. at PageID.293, and the parties engaged in negotiations to amend the terms of the Lease accordingly. During the course of these

communications, both parties expressed their optimism and enthusiasm regarding their contractual arrangement. *See id*. at PageID.292-97. Further, in the period between Lark's email to Hamama (on June 9, 2020) and the filing of this lawsuit (on August 28, 2020), defendants sent plaintiff two letters (dated June 30, 2020, and August 7, 2020) recognizing the continued existence of a contract between the parties and asserting their rights thereunder. *See* Def.'s Br. at 17 (citing Defs.' Ex. 4, at PageID.307, 314).

The facts of this case simply fail to meet the high threshold for establishing a claim of contractual repudiation. The Michigan Supreme Court has previously stated that

> [t]he law seems to be settled that a refusal to fulfill a contract must be absolute to be equivalent to its dissolution, and to authorize the other party to rescind it, such refusal should be in no way qualified, and should substantially amount to an avowed determination of the party not to abide by the contract.
>
> . . . . [A] mere assertion that a party will be unable or will refuse to perform his contract is not sufficient. It must be a distinct and unequivocal, absolute refusal to perform the promise and must be treated and acted upon as such by the party to whom the promise is made; and, if he afterwards continues to urge or demand compliance with the contract, it is plain he does not understand it to be at an end.

*Buys v. Travis*, 220 N.W. 798, 800 (Mich. 1928) (internal quotation marks and citations omitted). *See also Stoddard*, 593 N.W.2d at 640 (noting that for the doctrine of repudiation or anticipatory breach to apply, "a party to a contract [must] unequivocally declare[] the intent not to perform"). Based on the parties' words and actions, it is clear that neither side understood Lark's June 9, 2020, email to constitute an absolute refusal to perform. After Lark sent this email, both Encore and UJ-FL engaged in further negotiations, referred to the email as a request for delay, and expressed hope regarding the future of their business endeavors.

The Michigan Court of Appeals has similarly stated that voicing concern regarding

the cost of a project does not constitute an unequivocal declaration that the party will not pay its share or otherwise perform on the contract. *See Bd. of Washtenaw Cnty. Road Comm'rs v. Lincoln Consol. Sch. Dist.*, No. 304525, 2013 WL 5288915, at *9 (Mich. Ct. App. Sept. 19, 2013). Although defendants expressed concern regarding their finances and the time line of the Lease, they "stated neither that [they] would refuse, under any circumstances, to perform under the contract . . . nor that [they] would be unable to perform under the contract . . . ." *Com. Place, LLC*, 2005 WL 2655966, at *2.[4]

Plaintiff asserts, and the parties agree, that "UJ-FL unequivocally communicated to Encore on June 9, 2020 that [UJ-FL] will need to delay the construction start of the Troy site . . . ." Pl.'s Br. at 9 (emphasis omitted). However, an unequivocal request to delay, particularly one framed by Lark's hopeful language regarding the future of the parties' contract, cannot be understood as an unequivocal declaration that defendants would not perform. Plaintiff has therefore failed to show that defendants anticipatorily breached or repudiated the contract.

Because plaintiff's breach of contract claim fails, the Court must reach the same conclusion as to plaintiff's claim of breach of guaranty, as absent a contractual breach there is no liability under the Guaranty.

## II. Defendant UJ-FL's Motion to Amend its Answer

Next, defendant UJ-FL has filed a motion for leave to amend its answer to assert a counterclaim. Defendant argues that "if UJ-FL did not repudiate the Lease, Encore breached the

---

[4] In contrast to the facts presented in this case, in *Carpenter v. Smith*, 383 N.W.2d 248, 250 (Mich. Ct. App. 1986), the Michigan Court of Appeals found that defendants repudiated their contractual responsibilities when they actively contravened the purpose of the contract (e.g., failed to make payments) and "stipulated that they had no intention to perform at any time in the future." Defendants in this case took no such actions and made no such statements.

12

Lease." Def.'s Amend Br. at 2. Defendant states that, "[u]nder Sections 1.1(h) and 3.1 of the Lease, Encore was required to perform 'Landlord's Work,' which consists of construction improvements referred to as the 'Building Work' and the 'Common Area Work.'" *Id*. Accounting for the Lease amendments and the forty-five-day delay caused by the government-mandated construction suspension, defendant contends that plaintiff's deadlines to complete the Building Work and Common Area Work were July 15, 2020, and August 14, 2020, respectively. *See id.* at 3. Defendant alleges that "Encore missed both deadlines–it has not completed either the Building Work or the Common Area Work." *Id*. As required under Section 19.1 of the Lease, defendant "served on Encore a notice of default dated December 24, 2020." *Id*. Due to plaintiff's subsequent inaction, defendant alleges that its "claim for breach accrued effective January 24, 2021," thirty days after defendant issued its notice of default (the "cure period" allotted under the Lease). *Id.* Defendant adds that plaintiff has allegedly initiated negotiations "with a replacement tenant for at least part of the space UJ-FL was going to occupy under the Lease," which, if successful, "would make Encore's performance of the Lease impossible." *Id.* at 4.

In response, plaintiff contends that defendant is being disingenuous when it refers to its proposed counterclaim as a "recently accrued claim," "because it has been a long standing alleged claim against Encore since at least June 30, 2020," when defendant sent plaintiff the first notice of default. Pl.'s Amend Resp. Br. at 6. Plaintiff argues that consequently "UJ-FL's alleged claim *already* accrued when it served its answer to Encore's complaint [o]n October 5, 2020. Yet, UJ-FL strategically chose a path to not . . . pursue its counterclaim, which now appears as dilatory motive[,] bad faith[,] or both[,] causing substantial prejudice to Encore." *Id*. at 4 (emphasis in original). For these reasons, plaintiff contends that the Court should deny the motion. *Id*. Plaintiff adds that it believes defendant's counterclaim to be compulsory. *See id*. at 7.

13

In its reply brief, defendant acknowledges that the December 24, 2020, notice of default was its second. Defendant contends that "UJ-FL's original notice of default, dated June 30, 2020, was premature" given the forty-five-day delay caused by the government-mandated construction suspension, which was covered under the Lease's force majeure clause. *See* Def.'s Amend. Reply at 2.

Federal Rule of Civil Procedure 15(a)(2) states that after a responsive pleading is filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." "Rule 15 reinforce[s] the principle that cases should be tried on their merits rather than the technicalities of pleadings, and therefore assumes a liberal policy of permitting amendments." *Langley v. Credit Suisse First Boston Corp.*, 89 F. App'x 938, 943 (6th Cir. 2004) (internal quotation marks omitted). Likewise, the Supreme Court has stated that

> [i]f the underlying facts or circumstances relied upon by a [party] may be a proper subject of relief, [it] ought to be afforded an opportunity to test [its] claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.' Of course, the grant or denial of an opportunity to amend is within the discretion of the District Court, but outright refusal to grant the leave without any justifying reason appearing for the denial is not an exercise of discretion; it is merely abuse of that discretion and inconsistent with the spirit of the Federal Rules.

*Foman v. Davis*, 371 U.S. 178, 182 (1962). Finally, the Sixth Circuit has clarified that

> [t]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice. In determining what constitutes prejudice, the court considers whether the assertion of the new claim or defense would:

14

> require the opponent to expend significant additional resources to conduct discovery and prepare for trial; significantly delay the resolution of the dispute; or prevent the [party] from bringing a timely action in another jurisdiction.

*Phelps v. McClellan*, 30 F.3d 658, 662-63 (6th Cir. 1994) (internal quotation marks and citations omitted).

Based on the facts of this case, the Court concludes that there is no apparent reason to deny defendant's motion. Defendant filed the instant motion just one month after the claim accrued under the terms of the Lease and five months before the deadline for amending pleadings under the Court's Scheduling Order. *See* docket entry 11. Further, because defendant served plaintiff with two notices of default, plaintiff was aware of defendant's claim. In light of the Court's above conclusion regarding the parties' cross-motions for summary judgment, granting defendant's motion to amend will undoubtedly delay resolution of this dispute. Nonetheless, defendant raises a proper subject of relief and ought to be afforded the opportunity to test its claim on the merits. Moreover, because plaintiff contends that defendant's proposed counterclaim is compulsory, defendant could be entirely barred from bringing its claim were the Court to deny the instant motion. For these reasons, the Court will grant defendant's motion to amend its answer.

**III. Conclusion**

Accordingly,

IT IS ORDERED that defendants' motion for summary judgment is granted [docket entry 17].

IT IS FURTHER ORDERED that plaintiff's motion for summary judgment is denied

[docket entry 22].

IT IS FURTHER ORDERED that defendant UJ-FL's motion to amend its answer is granted [docket entry 26].

IT IS FURTHER ORDERED that plaintiff's motion to compel discovery and for costs is denied as moot [docket entry 18].

IT IS FURTHER ORDERED that defendants' motion for protective order quashing non-party subpoenas is denied as moot [docket entry 20].

                                                  s/Bernard A. Friedman
                                                  BERNARD A. FRIEDMAN
Dated: June 30, 2021                SENIOR UNITED STATES DISTRICT JUDGE
       Detroit, Michigan